## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **Public Interest Legal Foundation,** | : |
| **Plaintiff,** | : |
| | :     **Civil Action No. _____** |
| **v.** | : |
| | : |
| **Jocelyn Benson,** | : |
| **Defendant.** | : |
| | : |
| **Electronic Registration Information** | : |
| **Center, Inc.,** | : |
| **Movant.** | : |

## OPENING BRIEF IN SUPPORT OF
## NON-PARTY ELECTRONIC REGISTRATION INFORMATION CENTER, INC.'S
## MOTION TO QUASH SUBPOENA AND FOR PROTECTIVE ORDER
## AND TO TRANSFER THIS MOTION TO THE UNITED STATES DISTRICT COURT
## <u>FOR THE WESTERN DISTRICT OF MICHIGAN</u>

## TABLE OF CONTENTS

I.  NATURE AND STAGE OF THE PROCEEDINGS .......................................................... 1

II.  SUMMARY OF ARGUMENT ..................................................................................... 2

III.  RELEVANT FACTS ................................................................................................. 3

    A.  ERIC and Its Reports ..................................................................................... 3

    B.  ERIC's Use of Confidential and Proprietary Software .................................... 4

    C.  PILF's Targeting of ERIC .............................................................................. 5

    D.  PILF's Lawsuit Against Michigan and Its Subpoenas to ERIC ...................... 7

IV.  ARGUMENT ........................................................................................................... 9

    A.  The Subpoena Seeks Discovery That Is Irrelevant and
    Disproportionate to the Needs of the Underlying Case ....................................... 10

    B.  The Subpoena Seeks Discovery That Is in the Defendant's Possession ............... 14

    C.  The Subpoena Seeks Information Protected from Disclosure by
    Federal Law ........................................................................................................ 16

    D.  The Subpoena Requests Confidential and Proprietary Research and
    Development Information .................................................................................... 18

    E.  This Motion Should Be Transferred to the Forum Court ..................................... 19

V.  CONCLUSION ......................................................................................................... 20

## <u>TABLE OF CITATIONS</u>

**Page(s)**

**Cases**

*Apex Fin. Options, LLC v. Gilbertson*,
  No. 21-23, 2021 WL 965509 (D. Del. Mar. 15, 2021) ..........................................................13

*Baumer v. Schmidt*,
  423 F. Supp. 3d 3939 (E.D. Mich. 2019)..............................................................................15

*Benedict v. McMahon*,
  315 F.R.D. 447 (E.D. Pa. 2016)............................................................................................16

*Burgess v. Galloway*,
  No. 20-cv-6744, 2021 WL 2661290 (D.N.J. Jan. 28, 2021).....................................................9

*Burrows v. 3M Company*,
  No. 19-cv-1649, 2022 WL 3346413 (W.D. Wash. Aug. 12, 2022)........................................19

*In re Daimler Truck N. Am., LLC*,
  No. 23-mc-90, 2023 WL 2456069 (D. Del. Mar. 10, 2023)..................................................20

*Hayes v. Easterday*,
  No. CV 11-0681, 2012 WL 13207471 (E.D. Pa. Jan. 24, 2012) ............................................9

*KPH Healthcare Servs., Inc. v. Mylan N.S.*,
  No. 20-cv-2065, 2023 WL 1795537 (D. Kan. Feb. 7, 2023)................................................19

*Lady Liberty Transp. Co. v. Philadelphia Parking Auth.*,
  No. 05-cv-1322, 2007 WL 707372 (E.D. Pa. Mar. 1, 2007) ...............................................15

*Layman v. Junior Players Golf Academy, Inc.*,
  314 F.R.D. 379 (D.S.C. 2016) ..............................................................................................16

*Mannington Mills, Inc. v. Armstrong World Indus., Inc.*,
  206 F.R.D. 525 (D. Del. 2002) .............................................................................................10

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*,
  218 F.R.D. 423 (D. Del. 2003) ...............................................................................................9

*In re Modern Plastics Corp.*,
  890 F.3d 244 (6th Cir. 2018) ................................................................................................10

*North Atl. Operating Co. v. Dunhuang Grp.*,
  No. 18-mc-154, 2018 WL 3381300 (D. Del. July 11, 2018)................................................20

*PILF v. Benson*,
No. 21- 929 (W.D. Mich.)......................................................................................1

*PILF v. Boockvar*,
431 F. Supp. 3d 553 (M.D. Pa. 2019) .................................................................18

*PILF v. Boockvar*,
495 F. Supp. 3d 354 (M.D. Pa. 2020) .................................................................12

*Seven Bros. Painting, Inc. v. Painters & Allied Trades Dist. Council No. 22*,
No. 09-cv-12506, 2010 WL 11545174 (E.D. Mich. June 7, 2010) ....................15

*Solek v. K&B Transp., Inc.*,
No. 21-cv-10442, 2021 WL 5040235 (E.D. Mich. Oct. 29, 2021)......................10

*United States v. Missouri*,
535 F.3d 844 (8th Cir. 2008) ..............................................................................12

*Versata Software v. Internet Brands, Inc.*,
No. 11-mc-50844, 2011 WL 4905665 (E.D. Mich. Oct. 14, 2011)......................15

**Statutes**

18 U.S.C. § 2721 .............................................................................................2, 18

42 U.S.C. § 1306c .............................................................................................2, 17

52 U.S.C. § 20507(a)(4)(A) ...............................................................................2, 11

Mich. Comp. Laws § 168.509o............................................................................11

Mich. Comp. Laws § 168.509r ............................................................................11

Mich. Comp. Laws § 168.509z ............................................................................11

Mich. Comp. Laws § 168.509aa ..........................................................................11

Mich. Comp. Laws § 168.509dd..........................................................................11

**Other Authorities**

15 C.F.R. § 1110.102 ..........................................................................................17

Fed. R. Civ. P. 26 ........................................................................................ *passim*

Fed. R. Civ. P. 45 ........................................................................................ *passim*

## I.      NATURE AND STAGE OF THE PROCEEDINGS

Non-party the Electronic Registration Information Center, Inc. ("ERIC") moves to quash—and seeks a protective order barring—a deposition and document subpoena ("Subpoena") served on ERIC by the Public Interest Legal Foundation ("PILF") in connection with a lawsuit PILF brought against the Secretary of State of Michigan ("Michigan"). *See PILF v. Benson*, No. 21-929 (W.D. Mich.).

Rarely is a subpoena as transparently pretextual as this one. ERIC is a non-profit, non-partisan membership organization governed by its members, which comprise more than half of the 50 states and the District of Columbia. Its mission is to provide its members with information that can help them maintain more accurate voter rolls, reach out to potentially eligible but unregistered voters, and detect possible illegal voting. Sadly, however, ERIC has recently become a target of disinformation campaigns that, following the 2020 election, have sought to undermine trust in many routine aspects of election administration. PILF has fanned the flames, baselessly suggesting that ERIC is a tool of left-wing interest groups, lamenting the lack of a "competitor" to ERIC, and demanding that ERIC's member jurisdictions provide PILF with certain reports they receive from ERIC, notwithstanding that those reports contain data subject to federal-law prohibitions on disclosure. Indeed, prior to serving this Subpoena against ERIC, PILF served demands for production of certain ERIC reports on at least 16 ERIC members *other* than Michigan. When they refused, PILF sued four of those jurisdictions.

PILF's latest actions only confirm that its Subpoena is not a properly tailored effort to obtain information needed to prosecute its claims against Michigan, but rather an improper attempt to circumvent the legal objections of ERIC's member jurisdictions and burden and harass a non-party. When ERIC objected to PILF's initial subpoena on the grounds, *inter alia*, that it sought documents and information in Michigan's possession (including, principally,

certain reports that ERIC had provided Michigan), PILF responded by serving a *significantly broader* subpoena adding numerous topics that have no colorable bearing on PILF's claims against Michigan, but rather pursue the spurious campaign against ERIC that PILF has stoked.

## II.    SUMMARY OF ARGUMENT

For multiple reasons, the Subpoena should be quashed and a protective order issued:

1.      The discovery sought is neither relevant to, nor proportional to the needs of, PILF's case against Michigan. *See* Fed. R. Civ. P. 26(b)(1), (c)(1), 45(d)(3)(A)(iv). In that lawsuit, PILF claims that Michigan has not made a "reasonable effort" to remove the names of deceased voters from its voter roll as required by the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20507(a)(4)(A). This claim is premised on PILF's purported identification of thousands of persons on Michigan's voter rolls who, PILF asserts, may be deceased. PILF's counsel have asserted that discovery targeting ERIC is relevant to these allegations because Michigan has delegated or outsourced its voter-list-maintenance obligations to ERIC. But this premise is demonstrably false. Further, none of the information PILF seeks from ERIC bears on the dispositive questions in PILF's lawsuit: whether or to what extent PILF has accurately identified deceased voters on Michigan's voter roll, and whether PILF's list shows that Michigan has fallen short of the NVRA's "reasonable effort" standard.

2.      Assuming *arguendo* that some portion of the information PILF seeks is relevant to PILF's allegations against Michigan, that information is in Michigan's possession, and there is no justifiable basis to burden a non-party. *See* Fed. R. Civ. P. 45(d)(3)(A)(iv).

3.      The Subpoena seeks documents and information—namely, reports that ERIC has provided to Michigan—that are protected from disclosure by federal law because they contain data from the federal Limited Access Death Master File and motor vehicle records. *See* 18 U.S.C. § 2721; 42 U.S.C. § 1306c; Fed. R. Civ. P. 45(d)(3)(A)(iii).

4.      The Subpoena seeks confidential and proprietary information, the disclosure of which would compromise data security and divulge competitively sensitive intellectual property. *See* Fed. R. Civ. P. 26(c), 45(d)(3)(B)(i).  This information includes the process by which ERIC members apply a cryptographic hash to sensitive data elements (*e.g.*, social security numbers) before submitting data to ERIC, as well as the proprietary algorithm and software settings that make ERIC the most effective tool available to help election officials maintain accurate and up-to-date voter rolls.

5.      This motion should be transferred to the U.S. District Court for the Western District of Michigan, the forum for the underlying lawsuit, because (1) ERIC consents to transfer; (2) the forum court is better positioned to adjudicate the issues raised by this motion; and (3) transfer will avoid the risk of conflicting rulings. *See* Fed. R. Civ. P. 45(f).

## III.    RELEVANT FACTS

### A.    ERIC and Its Reports

Founded in 2012 by a bipartisan group of chief elections officials from seven states, ERIC's current membership comprises more than half of the 50 states and the District of Columbia. Declaration of Shane Hamlin ("Hamlin Decl.") ¶¶ 8-11. ERIC is funded and governed exclusively by its members. *Id.* ¶¶ 14, 22. ERIC's staff—it has only three full-time employees— and budget are commensurate with its limited operations, *i.e.*, the secure comparison and analysis of data and the furnishing of reports to its members. *Id.* ¶¶ 18-24.

Through a secure process, member jurisdictions provide ERIC with data from their voter-registration and motor-vehicle agencies at least every 60 days. *Id.* ¶ 31. ERIC also receives data from the federal government, including the National Change of Address data from the U.S. Postal Service and the Limited Access Death Master File ("LADMF")—a database identifying (by, *inter alia*, name, date of birth, and Social Security number) individuals who have been

reported as deceased to the Social Security Administration. *Id.* ¶¶ 32, 37. Using proprietary data-matching and analysis technology, ERIC then compares that information with data provided by other members to identify inaccurate or out-of-date voter records—for instance, voters who have moved to another jurisdiction—that might not be detectable based only on review of a member's own records. *Id.* ¶¶ 6-8, 13, 42-53.

Using this sophisticated data-matching analysis, ERIC provides each of its members with certain reports at their request. There are four "list maintenance" reports, which respectively identify voters who appear to have (1) moved from one member jurisdiction to another, (2) moved within a jurisdiction or updated their contact information, (3) duplicated registrations in the same jurisdiction, and (4) died ("deceased reports"). *Id.* ¶ 30. ERIC also offers reports that respectively identify (5) individuals who appear to be eligible but are not yet registered ("EBU reports"), (6) voters who have moved according to data from the U.S. Postal Service, and (7) potential illegal voting activity, *e.g.*, voters who may have cast multiple ballots in the same election ("participation reports"). *Id.* ¶¶ 36-38.

Although PILF's Subpoena sweepingly seeks discovery of all of these reports, *see, e.g.*, Declaration of Robert A. Wiygul ("Wiygul Decl."), Ex. 25, Matters for Examination ("MOE") Nos. 6, 9-11, the deceased reports appear to be PILF's primary focus. The deceased report includes certain protected LADMF data. Hamlin Decl. ¶¶ 32, 59.

### B.    ERIC's Use of Confidential and Proprietary Software

ERIC's website provides the public with extensive information about the organization's structure, membership, data security, operations, and reports, as well as a copy of its bylaws and membership agreement. *Id.* ¶ 69. But as is true with many organizations that rely on state-of-the-art data analysis, ERIC's processes and methods utilize confidential and proprietary information at multiple stages. Specifically, ERIC uses two proprietary technologies to generate its reports.

The first is a software program that compares information across the aforementioned datasets to detect "matches" where multiple datasets contain information that likely pertains to the same person. The software is not itself proprietary, but ERIC applies its own customized settings, without which the software could not fulfill its purpose. *Id.* ¶¶ 43-46. These custom settings are highly proprietary and have been developed and refined by ERIC over the course of more than a decade. ERIC was able to develop these custom settings only as a result of the expertise and institutional knowledge that ERIC and its staff have acquired about the intricacies of voter-registration and motor-vehicle data. *Id.* ¶¶ 47-48. To produce a report, ERIC feeds the matches for people registered in the applicable jurisdiction into an algorithm that analyzes each match to determine whether it meets the applicable criteria for that particular report (*e.g.*, have moved, died, etc.). This algorithm is entirely proprietary and was developed by ERIC. *Id.* ¶¶ 49-51.

To protect sensitive personally identifiable information during this process, ERIC relies on another piece of proprietary software: ERIC's unique "hashing" application. The data members transmit to ERIC contains highly sensitive, personally identifiable information, specifically, dates of birth, Social Security numbers, and driver's license/ID numbers. *Id.* ¶ 77. In order to keep this data secure, members use ERIC's proprietary software application to apply a cryptographic one-way hash to this data before transmitting it, so that its specific content is indiscernible. *Id.* ¶ 78. Hashing is a common process, but the application ERIC developed is unique in that it can apply consistent hashing across data sets, such that hashed data points from one source can be compared against hashed data points from other sources. *Id.* ¶¶ 79-81.

## C.     **PILF's Targeting of ERIC**

For many years, ERIC was not an object of political attention, let alone controversy. Its operations were viewed—accurately—as a matter of dry and technical data-processing. Recently, however, the disinformation campaigns spawned by the 2020 election have put ERIC in the

5

crosshairs of some who have baselessly "claimed that [ERIC] is actually a left-wing vehicle that shares sensitive voter data with liberal groups … and enables the very fraud it is intended to stamp out." Wiygul Decl., Ex. 1. Ignoring that ERIC is funded exclusively by its members, the same voices have labeled it a "Soros-backed operation." *Id.* And critics have, "without evidence," accused David Becker, an individual who helped found ERIC and "now leads the nonprofit Center for Election Innovation & Research[,] … of sharing ERIC data with liberal groups." *Id.* Although ERIC has worked to dispel these myths, Hamlin Decl. ¶¶ 90-92 & Ex. D, several states recently announced their withdrawal from ERIC, citing some of these unfounded concerns, *id.* ¶ 93. *See generally* Wiygul Decl., Ex. 2-4.

PILF has actively encouraged the skeptics. In remarks quoted on a website at the forefront of the disinformation campaign against ERIC, PILF's President, J. Christian Adams, asserted that ERIC was a "smoke screen"; he baselessly speculated that ERIC may "manipulat[e] the process" and "interfac[e] all [its] data with … [a] massive Democrat database organization." *Id.*, Ex. 5 (Gateway Pundit). Adams was also recently quoted musing about the prospect of "an effective replacement" of ERIC. *Id.*, Ex. 6 (Washington Times). Ken Blackwell, PILF's Treasurer, *id.,* Ex. 7, has encouraged ERIC members to withdraw from the organization, citing, without evidence, concerns about "compromised data" and "partisan funding," *id.*, Ex. 8. Cleta Mitchell, Chair of PILF's Board of Directors, has called ERIC a "very insidious organization" and also called on members to withdraw.[1] And in a March 2023 statement, PILF claimed that the recent withdrawal of several ERIC members somehow shows that ERIC should be more "transparent," and that its reports to members should be publicly disclosed. *Id.*, Ex. 9.

---

[1] *See* https://rumble.com/v1635pp-patrice-johnson-turning-the-election-integrity-lights-on-in-michigan.html, at 22:10-26:30.

PILF has been engaged in a years-long campaign to obtain ERIC's reports. Among other efforts, PILF sent letters to at least 16 of ERIC's members, demanding that they produce the deceased reports ERIC provided them. Hamlin Decl. ¶ 94 & Ex. G. When they refused—citing, *inter alia*, federal law protecting disclosure of LADMF data—PILF sued four of the members, contending that the reports were public records under the NVRA. *Id.* ¶¶ 95-96 & Ex. G; Wiygul Decl., Ex. 10-13.

Nor have PILF's efforts been restricted to ERIC's reports. In May 2022, PILF purported to serve a demand on ERIC under Florida's public-records law, which overlaps with the Subpoena here. The Florida demand sought all of ERIC's communications with its advisory boards and David Becker. *Compare* Hamlin Decl. ¶ 97 & Ex. I *with* Wiygul Decl., Ex. 25, MOE Nos. 3-4, 6. PILF did not pursue the effort after ERIC pointed out that it is not subject to Florida's public-records law. Hamlin Decl. ¶¶ 98-99 & Ex. J.

### D.      PILF's Lawsuit Against Michigan and Its Subpoenas to ERIC

PILF filed the underlying NVRA litigation against Michigan in late 2021, around the time it sued the other four ERIC members. Wiygul Decl., Ex. 14. The Complaint argues that Michigan's program for removing deceased registrants from its voter rolls is unreasonable, in violation of the NVRA. *Id.* The Complaint primarily relies for this conclusion on its allegation that PILF has commissioned a third party report that identifies over 25,000 deceased registrants on Michigan's voter rolls, and that Michigan has taken no action to rectify this situation. *Id.*

As a form of merits relief, the Complaint seeks access under the NVRA's public-records provision to, *inter alia*, the deceased reports that ERIC has provided to Michigan. *Id.* ¶ 39, Prayer for Relief ¶ 3 & Ex. 9. Rather than awaiting adjudication of that claim, however, PILF served a discovery request on Michigan asking it to produce the deceased reports that Michigan has received from ERIC. Wiygul Decl., Ex. 15, Request No. 8. Michigan objected that, *inter*

*alia*, the reports were protected from disclosure under federal law. *Id.*, Ex. 16, Response to Request No. 8.

On March 3, 2023, following Michigan's objection to PILF's request, PILF served ERIC with a non-party document and deposition subpoena. Wiygul Decl., Ex. 19. The subpoena sought production of four categories of documents: (1) all deceased reports ERIC has given Michigan since January 1, 2018; (2) all "communications" and (3) "contracts" between ERIC and Michigan regarding deceased Michigan registrants; and (4) "[a]ll records describing ERIC's processes or procedures for identifying deceased registrants." *Id.* The subpoena also directed ERIC to produce a witness to testify regarding deposition topics identical to the document categories. *Id.*

ERIC served written objections to the document requests under Fed. R. Civ. P. 45(d)(2)(B). Wiygul Decl., Ex. 20. Among other specified objections, including ones based on statutory protection of LADMF data and lack of relevance, ERIC noted that almost all of the documents and information could be obtained from Michigan. *Id.* ERIC informed PILF's counsel that ERIC objected to PILF's (identical) deposition topics on the same grounds. *Id.* ¶ 23.

PILF then stated that it would provide a response to ERIC's objections aiming to "narrow" the dispute. *Id.*, Ex. 22. Three days later, however, PILF announced that it was withdrawing its initial subpoena and replaced it with a *significantly broader* one. *Id.*, Exs. 24-25. The second subpoena set forth a number of entirely new topics, including "ERIC's relationship with the Center for Innovation and Research," ERIC's advisory boards, all of "ERIC's past and present Board Members" and ERIC's "vendors, contractors," and ERIC's "funding." *Id.*, Ex. 25. Indeed, even the four topics that relate to the original subpoena were expanded. PILF's demand for disclosure of "records," "communications," and "processes" was, inexplicably, no longer

8

even limited to information concerning deceased registrants. *Id.*, MOE Nos. 6, 9, 10 & 11. PILF also broadened—and made more nebulous and less particularized—its document requests. *See* Wiygul Decl., Ex. 26 (comparing requests in two subpoenas).

It is difficult to negotiate with a party that opens with a demand for $10,000, only to respond to objections by demanding $100,000. Nonetheless, in an act of good faith, ERIC accepted service of the second subpoena as of March 31, 2023, subject to a full reservation of rights. *Id.*, Ex. 27. Further meet-and-confer communications were unable to resolve the dispute. *Id.*, Exs. 28-29. On April 14, 2023, ERIC served written objections to the Subpoena's document requests. *Id.*, Ex. 30.

## IV.    ARGUMENT

"On timely motion, the court for the district where compliance is required must quash or modify a subpoena that … requires disclosure of privileged or other protected matter, … [or] subjects a person to undue burden." Fed. R. Civ. P. 45(d)(3)(A)(iii)–(iv). In addition, a court may "quash or modify the subpoena if it requires … disclosing a trade secret or other confidential research, development, or commercial information." Fed. R. Civ. P. 45(d)(3)(B)(i). Similarly, a court may "for good cause, issue an order to protect a party or person from … undue burden" by "forbidding the disclosure or discovery," including by "requiring that a trade secret or other confidential research, development, or commercial information not be revealed." Fed. R. Civ. P. 26(c)(1)(A) & (G).

In applying these standards, courts must "consider the fact that a subpoena targets a non-party, [and] … impose[] broader restrictions on the scope of discovery when a non-party is targeted." *Hayes v. Easterday*, No. CV 11-0681, 2012 WL 13207471, at *2 (E.D. Pa. Jan. 24, 2012) (citations and internal quotation marks omitted); *accord Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 218 F.R.D. 423, 424 (D. Del. 2003); *Burgess v. Galloway*, No. 20-cv-

6744, 2021 WL 2661290, at *2 (D.N.J. Jan. 28, 2021) ("The standards for nonparty discovery require a stronger showing of relevance than for simple party discovery."); *In re Modern Plastics Corp.*, 890 F.3d 244, 251 (6th Cir. 2018). For all of the following reasons, the Court should quash the Subpoena in its entirety and grant a protective order in ERIC's favor.

### A. The Subpoena Seeks Discovery That Is Irrelevant and Disproportionate to the Needs of the Underlying Case

First, the Subpoena should be quashed because it seeks discovery that is neither "relevant to any party's claim or defense" in the underlying action, nor "proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). Courts interpret Rule 45 to incorporate the relevance and proportionality standards of Rule 26, and courts routinely quash non-party subpoenas where the requests are irrelevant or disproportionate. *See, e.g.*, *Mannington Mills, Inc. v. Armstrong World Indus., Inc.*, 206 F.R.D. 525, 529 (D. Del. 2002); *Solek v. K&B Transp., Inc.*, No. 21-cv-10442, 2021 WL 5040235, at *2 (E.D. Mich. Oct. 29, 2021).

Here, the Subpoena seeks three categories of discovery from ERIC, none of which are relevant or proportional: (1) all communications and information exchanged between ERIC and Michigan, including but not limited to deceased reports[2]; (2) the processes and methods used by ERIC in generating its reports[3]; and (3) unbounded information about virtually anything touching ERIC, including its relationships, past and present board members, structure, and funding.[4]

As to the first category, the content of ERIC's deceased reports is not relevant to any claim or defense in the underlying lawsuit. *A fortiori*, then, PILF's request for *all* communications and information exchanged between Michigan and ERIC is far outside the bounds of Rule 26(b)(1). The issue in PILF's lawsuit against Michigan is whether Michigan has

---

[2] Wiygul Decl., Ex. 25, Requests for Production Nos. 1 & 2; MOE Nos. 9-11.
[3] *Id.*, Requests for Production Nos. 3 & 4; MOE No. 6.
[4] *Id.*, MOE Nos. 1-5, 7 & 8.

made "a reasonable effort" to remove the names of deceased registrants from its voter rolls, as required by the NVRA. 52 U.S.C. § 20507(a)(4)(A). PILF's Complaint is premised on the allegation that PILF commissioned a report purporting to show that at least 25,000 deceased registrants remain on Michigan's voter rolls. PILF claims that it provided its report to the Michigan Secretary of State, but the Secretary allegedly took no action. Wiygul Decl., Ex. 14 ¶ 59. PILF asserts that these facts are prima facie evidence of the unreasonableness of Michigan's voter-roll maintenance program. *Id.*

PILF's only stated theory as to why ERIC's reports are probative of the truth or falsity of its allegations is that "ERIC is an integral part of Michigan's voter list maintenance program." *Id.*, Ex. 28. But this theory rests on a factual misunderstanding. Contrary to PILF's suggestion, Michigan does not delegate to ERIC, in whole or in part, the state's statutory obligation to conduct a reasonable voter list maintenance program. Under Michigan law, it is state election officials, not ERIC, who are responsible for maintaining Michigan's voter rolls. *See, e.g.*, Mich. Comp. Laws §§ 168.509o, r, z, aa, dd. Indeed, these officials utilize a variety of methods wholly separate from ERIC reports to conduct voter list maintenance. Notably, Michigan is obligated under state law to regularly obtain its *own* copy of the Social Security Administration's LADMF. The Secretary of State must review LADMF data at least once per month and cancel the voter registrations of registrants determined to be deceased. *See id.* § 168.509o(4).

In addition to this and other methods of voter list maintenance, Michigan receives a deceased report from ERIC approximately once every two months that—based also on a comparison with the LADMF—identifies potentially deceased voters on Michigan's voter rolls. But the record in the underlying lawsuit makes clear that Michigan does not rely on ERIC's reports as a substitute for its own voter list maintenance methods. Instead, Michigan uses these

reports as but one tool to confirm that its methods have been successful. Michigan election officials deposed by PILF have testified that they primarily maintain the state's voter rolls based on their own review of LADMF data that they independently receive directly from the federal government. Wiygul Decl., Ex. 17, 65:2-13, 69:9-71:13; *id.*, Ex. 18, 87:4-90:6. And in using the deceased reports as a cross-check,[5] Michigan does not rely on them uncritically; after receiving a deceased report from ERIC, Michigan election officials undertake an independent review of each person named therein—including a comparison of the data in the ERIC report to the data in Michigan's voter record, as well as, where appropriate, a review of obituaries—in determining whether to cancel that person's voter registration. *Id.*, Ex. 17, 72:15-76:4, 82:12-83:12, 111:13-115:9; *id.*, Ex. 18, 101:23-108:22.

Particularly on these facts, it is clear that the contents of ERIC's deceased reports are not probative of PILF's allegation that Michigan has failed to make a "reasonable effort" to maintain its voter rolls. More fundamentally, the proper focus of the underlying lawsuit is not on the *specific content* of the data that Michigan receives but on what Michigan *does* with the information available to it. PILF concedes as much in its Complaint, by resting its claim on the allegation that Michigan has "fail[ed] to act upon the information provided by the Foundation" that over 25,000 deceased persons remain registered to vote. *Id.*, Ex. 14 ¶ 59. Other courts faced with NVRA lawsuits have similarly examined the actions and procedures of specific states, rather than the specific content of data. *See United States v. Missouri*, 535 F.3d 844, 849 (8th Cir. 2008) ("Under the plain language of the statute, states must *take specific actions* . . . .") (emphasis added); *PILF v. Boockvar*, 495 F. Supp. 3d 354, 359 (M.D. Pa. 2020) (noting that

---

[5] It is clear that a jurisdiction can comply with the NVRA's "reasonable effort" standard without receiving or utilizing *any* ERIC reports. If that were not the case, then the roughly 40% of the 50 states who are not ERIC members would be in *per se* violation of the statute.

unreasonableness for NVRA purposes would require "proof[] of a specific breakdown in Pennsylvania's voter registration system"). Discovery here should be cabined accordingly.

The second category of discovery requests listed in the Subpoena—the processes and methods used by ERIC in generating its deceased reports—is one step further removed from the underlying question: whether Michigan's voter list maintenance program is reasonable. This category of discovery is thus even more clearly irrelevant, and correspondingly more disproportionate to the needs of the case. Put differently, even if the specific content of particular deceased reports were somehow probative of PILF's claims against Michigan, that would not render relevant the technical details of ERIC's processes and methods. PILF's requests on this topic thus represent a pure fishing expedition, something to which the Rules do not subject any party, much less a non-party. *See Apex Fin. Options, LLC v. Gilbertson*, No. 21-23, 2021 WL 965509, at *5 (D. Del. Mar. 15, 2021).

Moreover, PILF's theory of relevance plainly proves too much. If PILF is entitled to discovery into ERIC's processes and methods—based solely on the fact that Michigan makes some use of ERIC reports in its voter roll maintenance program—then any NVRA plaintiff could burden ERIC (or, for that matter, any other third-party source of information used by a jurisdiction in maintaining its voter roll[6]) with onerous discovery whenever the plaintiff alleges (and simply by virtue of alleging) that a jurisdiction has "too many" ineligible voters on its rolls. Not only would that license unfounded fishing expeditions, it would impose a crushingly undue burden. Unlike states subject to the NVRA, ERIC does not have an attorney general's office to represent it in such litigation, nor does it have the staff or budget to respond to such discovery.

---

[6] Those sources are too numerous to list, and would include the Social Security Administration, motor vehicle departments, credit reporting bureaus, hospitals, coroners, local newspapers, and more.

Hamlin Decl. ¶¶ 20-25. To countenance such discovery against ERIC here would thus set a dangerous precedent.

Finally, the Subpoena includes a third category of requests, which collectively seek information about ERIC's board members, funding, structure, and relationships. This category encompasses the majority of the Subpoena's proposed deposition topics—and echoes the Florida public-records request PILF sent to ERIC last year. Here, the Court's task is particularly easy: all of these requests are *plainly* irrelevant; none has any bearing on whether Michigan is making a statutorily sufficient effort to maintain its voter rolls. PILF's inclusion of such discovery requests—despite ERIC's repeated objections that the Subpoena is overbroad and seeks irrelevant discovery—serves only to confirm the pretextual nature of the Subpoena. The first such request, for deposition testimony about "ERIC's origins, funding, purpose, and capabilities" self-evidently bears no relation to the underlying NVRA claim. Rather, the content of this request relates instead to the unfounded (and irrelevant) assertion that, *inter alia*, ERIC is a "Soros-backed operation." *See supra* Section III.C. Likewise, the Subpoena's request for deposition testimony about "ERIC's past and present Board Members" and relationship with Center for Election Innovation & Research is a transparent stalking horse for the aforementioned spurious claims. *See id.* These discovery requests could only generously be described as irrelevant. Tellingly, PILF did not even include them in its initial subpoena. *See* Wiygul Decl., Ex. 26.

**B.    <u>The Subpoena Seeks Discovery That Is in the Defendant's Possession</u>**

Even if the contents of ERIC's deceased reports were relevant to the underlying NVRA claim, PILF's proper recourse would be to seek them from Michigan, not from ERIC. The reports—as well as communications and contracts between ERIC and Michigan—are self-evidently in Michigan's possession. There is no justification for burdening any non-party—much

less a nonprofit organization with only three full-time employees and no permanent litigation staff—with such a request.

Faced with a Rule 45 subpoena to a non-party, "the court must limit the scope of discovery if it determines that the discovery . . . can be obtained from some other source that is more convenient [or] less burdensome. Under this principle, courts . . . have repeatedly denied motions to compel discovery and quashed subpoenas directed to non-parties where the discovery sought was obtainable from a party to the litigation." *Baumer v. Schmidt*, 423 F. Supp. 3d 393, 40809 (E.D. Mich. 2019) (citing cases). Accordingly, a party seeking non-party discovery should be required to demonstrate that such discovery *cannot* be obtained from a party to the litigation or from another less burdensome source. *See Lady Liberty Transp. Co. v. Philadelphia Parking Auth.,* No. 05-cv-1322, 2007 WL 707372, at *9 (E.D. Pa. Mar. 1, 2007); *see also Seven Bros. Painting, Inc. v. Painters & Allied Trades Dist. Council No. 22*, No. 09-cv-12506, 2010 WL 11545174, at *3 (E.D. Mich. June 7, 2010) (quashing a subpoena *duces tecum* on the ground that the "plaintiff has made no showing that it cannot obtain relevant information from other sources, including [one] who is actually a party to this case"). Moreover, the law makes no distinction between document subpoenas and deposition subpoenas: courts routinely quash deposition subpoenas where a party to the litigation could be examined on the same issues. *See Versata Software v. Internet Brands, Inc.*, No. 11-mc-50844, 2011 WL 4905665, at *2 (E.D. Mich. Oct. 14, 2011) (quashing a subpoena for a Fed. R. Civ. P. 30(b)(6) deposition issued to a non-party on the ground that the court was "not persuaded that the information [plaintiff] seeks cannot be obtained from [defendant]").

Throughout the lengthy meet-and-confer process undertaken here, PILF has never offered ERIC a rationale for why it seeks from a non-party discovery that is already in the possession of

a party. The truth of the matter is that PILF already *has* sought to obtain ERIC's deceased reports

directly from the defendant, but Michigan has objected to this request, *see* Wiygul Decl., Ex. 16,

Response to Request No. 8, and PILF has not filed a motion to compel. The Subpoena to ERIC

for the same documents that PILF has already requested from the defendant thus represents an

improper end-run by PILF around Michigan's objection and the authority of the forum court to

adjudicate this dispute. To utilize a non-party subpoena for this purpose is inconsistent with

PILF's duty to "take reasonable steps to avoid imposing undue burden or expense on a person

subject to the subpoena," Fed. R. Civ. P. 45(d)(1), and further inconsistent consistent with the

federal rules more generally, *see Layman v. Junior Players Golf Academy, Inc.*, 314 F.R.D. 379,

385 (D.S.C. 2016) (providing that Rule 45 does not provide an end-run around the other rules

governing the discovery process). For this reason too, the Subpoena's requests seeking discovery

of information and communications exchanged between Michigan and ERIC should be quashed.

     **C.**     **The Subpoena Seeks Information Protected from Disclosure by Federal Law**

     The Subpoena's requests seeking the content of ERIC's deceased reports should be

quashed for a third, independent reason: these reports contain confidential information from the

LADMF, the disclosure of which is restricted by federal law. The Subpoena thus impermissibly

seeks disclosure of a "protected matter," Fed. R. Civ. P. 45(d)(3)(A)(iii), a term that

encompasses material whose disclosure is disallowed by other provisions of law, *see, e.g.*,

*Benedict v. McMahon*, 315 F.R.D. 447, 452 (E.D. Pa. 2016) (holding that information protected

from disclosure by a state statute relating to expunged criminal records was a "protected matter"

within the meaning of Rule 45(d)(3)(A)(iii), and quashing a subpoena for such information).

     Each deceased report delivered by ERIC to a member state contains personally

identifiable information (name and date of death) from the LADMF regarding individuals who

are reported to have died. Access to this data for individuals who have died within the last three

years is restricted to entities that, like ERIC, are certified by the Secretary of Commerce to access such information. 42 U.S.C. § 1306c(a); Hamlin Decl. ¶¶ 32, 59-60. In order to receive certification, an entity must affirm that it has "a legitimate fraud prevention interest" or "a legitimate business purpose pursuant to a law, governmental rule, regulation, or fiduciary duty." *Id.* § 1306c(b)(2)(A)(i)–(ii). An entity seeking certification must also show that it "has systems, facilities, and procedures in place to safeguard such information, and experience in maintaining the confidentiality, security, and appropriate use of such information." *Id.* § 1306c(b)(2)(B); *see also* 15 C.F.R. § 1110.102 (setting forth additional requirements for licensure). Certified entities may access LADMF information for approved purposes and may further disclose LADMF information to other entities who also meet the certification requirements. 15 C.F.R. § 1110.102(a)(4)(i). Certified entities may not, however, disclose LADMF information to entities who do not meet the certification requirements. *Id.*; 42 U.S.C. § 1306c(c)(1)(A). A certified entity that discloses LADMF information in violation of this provision is subject to a civil penalty of $1,000 per violation and risks the loss of its own certification. 42 U.S.C. § 1306c(c); 15 C.F.R. § 1110.102(a)(4)(i).

ERIC is certified by the Secretary of Commerce to access LADMF information and may disclose this information to its member states via its deceased voter reports. On information and belief, however, PILF is not authorized to access protected LADMF data.[7] And PILF may not

---

[7] *See* Declaration of Logan Churchwell ¶ 6, *Public Interest Legal Foundation v. Benson*, No. 21-929, ECF No. 69-3 (W.D. Mich. Mar. 27, 2023) (stating that PILF does not currently possess Social Security death data). That PILF seeks to subpoena ERIC for protected LADMF data serves as yet further confirmation that the subpoena is pretextual. In the underlying lawsuit against the Michigan Secretary of State, PILF is claiming the right to access  records containing LADMF information as a form of *merits* relief. Wiygul Decl., Ex. 14 ¶¶ 68–73 & Prayer for Relief ¶ 3. But rather than litigating this claim to judgment, PILF is again attempting an end-run around the authority of the forum court to adjudicate this dispute by seeking the same records from ERIC directly.

use a subpoena to compel ERIC to violate the statutory restrictions. Rule 45(d)(3)(A)(iii); *see also PILF v. Boockvar*, 431 F. Supp. 3d 553, 561-64 (M.D. Pa. 2019) (PILF cannot invoke NVRA to obtain information specifically protected by a data-privacy statute).

Additionally, Deposition Topics 9 and 10 are worded so broadly that they encompass the content of ERIC reports *other than* the deceased reports—including ERIC's "Cross-State Movers," "In-State Updates," and "Eligible but Unregistered" reports. These requests are plainly irrelevant, disproportionate, and overbroad, as the underlying lawsuit concerns only allegations related to deceased voters. Moreover, the aforementioned reports contain information from state motor vehicle departments, Hamlin Decl. ¶ 66, the disclosure of which is independently barred by the Driver's Privacy Protection Act, a federal criminal statute that prohibits disclosure of a driver's personal information without the driver's consent. 18 U.S.C. § 2721; *see Boockvar*, 431 F. Supp. 3d at 561-64. Accordingly, any request encompassing such reports should be quashed.

**D.      The Subpoena Requests Confidential and Proprietary Research and Development Information**

Finally, the Court should also quash the Subpoena because it purports to require ERIC to divulge "confidential research, development, or commercial information." Fed. R. Civ. P. 45(d)(3)(B)(i). Specifically, several of the Subpoena's requests relate to ERIC's processes and methods for generating its reports, which involve proprietary methods subject to protections for trade secrets and similar confidential information. As previously discussed, in generating its deceased reports—as well as its other reports—ERIC utilizes trade secrets and other proprietary information at multiple stages. *See supra* Section III.B; Hamlin Decl. ¶¶ 42-56, 77-87. All of this proprietary information is necessary for ERIC to perform its role effectively and securely. Granting PILF access to such information through discovery would compromise ERIC's ability to protect sensitive data and unfairly deprive ERIC of the competitive advantages that it has

legitimately obtained through its years of work in this field. *See* Hamlin Decl. ¶¶ 42-54, 89. The threat of competitive harm posed by the disclosure of this information is particularly acute given the fact that several entities are expressly aspiring to create products intended to compete with ERIC's reports. *See id.* ¶ 55 & Ex. B-C. This is precisely the type of harm that Rule 45(d)(3)(B)(i) is intended to avoid, and courts routinely quash subpoenas on the ground that they would allow the subpoenaing party to obtain or reverse-engineer the moving party's trade secrets. *See KPH Healthcare Servs., Inc. v. Mylan N.S.*, No. 20-cv-2065, 2023 WL 1795537, at *4 (D. Kan. Feb. 7, 2023) (quashing a subpoena for a party's sales data where such data would allow the subpoenaing party to "reverse-engineer [the moving party's] proprietary, expensively developed, sales analytical tool," and thus undermine the moving party's competitive strategy). This is true whether the subpoenaing party seeks to obtain such information through deposition testimony or document requests. *See Burrows v. 3M Company*, No. 19-cv-1649, 2022 WL 3346413, at *3 (W.D. Wash. Aug. 12, 2022) (quashing deposition subpoena because "the depositions are likely to delve into protected matters or otherwise require disclosure of defendant's trade secret or other confidential research or development information"). The Court here should quash the Subpoena on this basis as well.

### E.   This Motion Should Be Transferred to the Forum Court

Pursuant to Rule 45(f) of the Federal Rules of Civil Procedure, ERIC consents to—and requests—a transfer of this Motion to the U.S. District Court for the Western District of Michigan, which is the forum court for the underlying action between PILF and Michigan. Such a transfer would conserve judicial resources and avoid the risk of inconsistent rulings.

As to judicial resources, ERIC has moved to quash the Subpoena because, *inter alia*, it seeks discovery not relevant to the claims in the underlying lawsuit and not proportional to the needs of that case. The issuing court is already familiar with the details of the underlying lawsuit,

having presided over the case since November 2021. That court can more efficiently determine the particular issues presented here. *See In re Daimler Truck N. Am., LLC*, No. 23-mc-90, 2023 WL 2456069, at *2 (D. Del. Mar. 10, 2023) (transfer was appropriate where "the issuing court has greater involvement and more familiarity with the underlying … litigation such that transfer back to that court promotes judicial economy").

As to the risk of inconsistent rulings, the Subpoena seeks discovery that is already the subject of an unresolved dispute between the parties to the underlying lawsuit. Specifically, PILF has requested that Michigan produce the ERIC "deceased reports" it received from 2018 to the present. Michigan has objected to this request, as ERIC has objected here, on the ground that these reports contain LADMF data, which is protected from disclosure under federal law. Transfer would ensure that ERIC's and Michigan's objections are resolved consistently. *See North Atl. Operating Co. v. Dunhuang Grp.*, No. 18-mc-154, 2018 WL 3381300, at *2 (D. Del. July 11, 2018) (transferring a motion to quash to the forum court "so as to not disrupt [its] management" of the underlying litigation" and to "avoid the risk of inconsistent rulings").

## V.    CONCLUSION

For the foregoing reasons, the Court should transfer this Motion to the Western District of Michigan, whereupon the Subpoena should be quashed and a protective order entered in ERIC's favor.

Dated: April 18, 2023

*Of Counsel*:
Robert A. Wiygul (PA Bar ID 310760)
Peter V. Keays (PA Bar ID 321474)
HANGLEY ARONCHICK SEGAL
PUDLIN & SCHILLER
One Logan Square, 27th Floor
Philadelphia, PA  19103

Respectfully submitted,

BODELL BOVE LLC

/s/ Bruce W. McCullough
Bruce W. McCullough (DE Bar ID 3112)
1225 N. King Street, Suite 1000
Wilmington, DE  19801
Telephone: (302) 655-6749
bmccullough@bodellbove.com
*Attorneys for Electronic Registration Information Center, Inc.*